Filed 5/30/24  In re L.M. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re L.M. et al., Persons Coming Under the Juvenile Court Law.

RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,

    Plaintiff and Respondent,

v.

R.M.,

    Defendant and Appellant.

E082676

(Super. Ct. No. DPRI2300216)

OPINION

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Affirmed in part, remanded with directions.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham, and Julie Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

I.

INTRODUCTION

R.M. (Father) appeals from jurisdiction and disposition findings and orders entered on November 21, 2023, in which the juvenile court found jurisdiction over Father's daughters, L.M. (7 years old) and G.M. (6 years old), under Welfare and Institutions Code, section 300, subdivisions (b) and (c),[1] and ordered the girls removed from Father's sole care. Father contends there was insufficient evidence to support the jurisdiction and disposition findings and orders. Father also argues the juvenile court erred in finding that ICWA[2] does not apply and requests this court to vacate that finding.

We conclude there was substantial evidence supporting the jurisdiction and disposition orders, and affirm the orders and judgment, but order vacated the finding that ICWA does not apply and remand for further proceedings.

---

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code. Because ICWA uses the term "Indian," we do so on occasion as well, not out of disrespect, but because of the need for clarity and consistency, even though we recognize that other terms, such as "Native American" or "indigenous" are preferrable.

[2] As used in this opinion, the term "ICWA" refers to the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) and California Indian Child Welfare Act (Welf. & Inst. Code, § 224 et seq.), collectively.

## II.

## FACTS AND PROCEDURAL BACKGROUND

A. *Pre-Petition Referrals*

On May 11, 2023, shortly after the girls' mother died in January 2023, the Riverside County Department of Public Social Services (DPSS) received a referral alleging general neglect and physical abuse of the girls by Father. Father reportedly hit the girls, yelled at them, and withheld food as punishment. He also abused the girls' half-sibling, R.M., and was prohibited from having contact with him, other than in a therapeutic setting. It was further reported that Father locked himself in the bathroom during the night to smoke marijuana. This conduct required the girls to hold their urine while he was in the bathroom because they feared Father would yell at them if they tried to use the bathroom.

On May 22, 2023, R.M.'s therapist reported that, when Father showed up at her office, he was verbally aggressive with staff, recorded them, threatened them, and insisted on being present during the girls' sessions, when he was not welcomed. The therapist also reported that Father was verbally aggressive with his children, struck them with a belt, and locked himself in the bathroom at night, which caused the girls to be frightened.

DPSS interviewed the girls at their school. The girls denied any concerns about Father, denied that Father used physical discipline at home, and said they felt safe at home. However, L.M. confirmed Father spent an excessive amount of time in the

3

bathroom, which caused her to worry. DPSS reported that it believed the girls had been coached, based on their choice of words and syntax, which were not typical of children their age. They spoke of adult matters, including Father's possible involvement in their mother's murder and the pending family court proceedings concerning R.M.

On May 26, 2023, Father contacted DPSS, accusing DPSS of harassing him and violating his Fourth Amendment rights during a prior investigation regarding R.M. DPSS explained that it contacted him because of a new referral. In response, Father reportedly was verbally aggressive and hostile and used excessive profanity. He stated he was recording the call and ultimately hung up.

On June 2, 2023, DPSS received a second referral alleging Father was alienating the girls from their extended family due to his health diagnosis of bipolar and posttraumatic stress disorder (PTSD). He also was smoking marijuana in the girls' presence, and refused to acknowledge the mental health needs of the girls as they grieved the recent murder of their mother. He reportedly threw away all clothing the mother purchased for the girls, removed all of her pictures from the home, and did not allow the girls to speak her name or cry.

On June 5, 2023, DPSS received a third referral stating concern for the girls' family because of Father's paranoia and because he carried a gun without a concealed carry permit. There were also concerns about his mental health, marijuana usage, and purchasing unknown pills from drug dealers. In addition, the girls had stated he would hit them if they did not do what he said.

4

The following day a paternal family member reported concern about the safety and wellbeing of the girls because of Father's mental health-related behaviors. The girls had told the relative that Father had forbidden them from mentioning their mother and grieving her loss. They reportedly sat in front of their mother's picture, talking to her and crying, distraught over her death. Father reportedly displayed dichotomous and severe behavior. One moment he would be loving and inclusive and then he would become hostile and verbally aggressive. The girls said he requested the girls be picked up from him because he was "'going crazy'" and needed to get his medication. Father said he would not be able to appear in family court in his current state.

DPSS reported that Father has an extensive child welfare history, in which DPSS had conducted numerous investigations involving his family, because of his mental health issues and behavior. Referrals dated back to 2015, and included allegations of general neglect, physical abuse, emotional abuse, and failure to cooperate and participate in services. During an investigation in March 2021, Father reportedly admitted to having taken the girls and R.M. to a marijuana dispensary and leaving them in the car while making a purchase. During an investigation in October 2022, R.M. reported Father smoked marijuana in the home, and scared R.M. when Father screamed. R.M. began to cry when he was told Father would be made aware of the information he provided DPSS. R.M.'s mother also expressed fear of Father and was concerned about his effect on all of the children's mental health.

5

B. *Juvenile Dependency Petition*

On June 21, 2023, DPSS filed a juvenile dependency petition on behalf of the girls, under section 300, subdivision (b)(1).  DPSS amended the petition to add an allegation under section 300, subdivisions (c).  When the petition was filed, the girls were not detained and remained in Father's care.  The amended petition (Petition) allegations under section 300, subdivision (b), state that Father had unresolved mental health issues, including PTSD from head injuries sustained while serving in the army, and exhibited symptoms including manic episodes, verbal aggression, hostility, and paranoid behavior.  In addition, Father allegedly abused controlled substances, including marijuana, while caring for the girls, and has a criminal history, including several arrests for drug and alcohol-related charges.

The section 300, subdivision (c), Petition allegations state the girls suffered, or were at risk of suffering serious emotional harm because Father prohibited them from grieving their mother's loss.  In addition, Father has an extensive family law history with the girls' deceased mother and with R.M.'s mother.  Father was currently prohibited from having any contact with R.M. unless in a therapeutic environment because R.M. had sustained emotional abuse by Father.

During the detention hearing on July 7, 2023, the court issued protective custody warrants for the girls.  Father submitted documents, which included a letter dated June 27, 2023, from the Veterans Administration (VA) Loma Linda Healthcare System.  The letter stated that Father was receiving mental health treatment, which included therapy for

6

mental health concerns.  The letter also said Father contacted the VA crisis line call center as needed and had future appointments scheduled to continue his treatment.  The court found that detention was appropriate and ordered the girls removed from Father's care and placed with a paternal relative caregiver.  The court ordered supervised visitation and ordered Father to participate in a mental health evaluation.

On August 11, 2023, Father filed a notice of appeal challenging the July 7, 2023, detention hearing findings and orders (*In re L.M.. et al.; DPSS v. R.M.* (E081930)).  This court dismissed the appeal on our own motion, on the ground a dispositional hearing order had not yet been entered and therefore there was no appealable judgment.

C. *JV-180 Request to Change Court Order Petition*

On July 13, 2023, Father filed a JV-180 request (JV-180 petition) to change the July 7, 2023 order.  Father alleged that during the detention hearing, his Fourteenth Amendment rights to due process were violated when his court-appointed attorney, who allegedly had "a vendetta" against him, made inculpatory remarks and failed to show DPSS his exculpatory documents.  The juvenile court granted Father's JV-180 petition and ordered new counsel appointed for Father.

D. *Jurisdiction and Disposition Reports and Proceedings*

DPSS reported that when interviewing Father on July 17, 2023, he went off on tangents, would not address the petition allegations, and ruminated on his alleged failure to receive due process.  During his lengthy tirades, he acknowledged his diagnosis of PTSD and suffering from a traumatic brain injury.  He denied having manic episodes,

7

verbal aggression, hostility, or paranoia and stated he was participating in therapy and taking his medication as directed. Father said the Petition's allegations regarding his abuse of controlled substances, such as marijuana, were misrepresentations. He admitted consuming marijuana but did not address reports that he left the girls in the car while visiting a dispensary.

Father denied the Petition allegations that the girls suffered serious emotional distress as a result of him prohibiting them from mentioning their deceased mother or grieving her loss. He further denied G.M. disclosed knowledge about age-inappropriate information regarding her mother's death and that she felt obligated to defend Father. Father stated that he encouraged the girls' involvement with the church "because their mother is in heaven." Father acknowledged that the girls' mother had a restraining order against him up until she passed.

DPSS further reported that Father participated in a psychological evaluation, with a "probable diagnosis" of PTSD, unspecified personality disorder turbulent type with narcissistic and compulsive features, and cannabis use disorder. The psychologist recommended that Father complete parenting and anger management classes, as well as continue his current therapeutic components. Father acknowledged he had a PTSD diagnosis, which he said he had since 2011, after his first tour in the army. He denied any substance abuse but admitted consuming marijuana. Father said that he had custody of the girls since 2019.

8

DPSS also interviewed the girls. They said they loved Father. He disciplined them by withholding their cell phones or giving them time-outs. Sometimes he would spank them. They denied he yelled at them and said they had sufficient food. They also said he stayed in the restroom for long periods of time.

Father reportedly visited the girls on July 17, and 19, 2023. The girls were happy to see him, but instead of engaging with them, Father "launched into a verbal diatribe about his federal lawsuit" and was "irate, loud, disruptive, and verbally aggressive." The girls looked startled and concerned about Father's behavior. He was heard "grilling his children regarding their placement."

On July 24, 2023, Father called DPSS and cancelled his visit because of a new job, and then accused DPSS of withholding the girls from him and preventing visits. He left numerous voicemails and texts over a span of several hours. The next day, DPSS called Father to see if he wished to change his visitation schedule. Father did not answer the call. Instead, he engaged "in his usual electronic assault of copious text messages and voice memos." When Father showed up for his visit on July 26, 2023, he became irate, threatened to sue the social worker and others in federal court, and threatened to record those in the DPSS office. Father failed to visit on July 31, 2023, and sent DPSS messages regarding his lawsuit, perceived harassment, and other complaints. DPSS tried to schedule visits with Father but was unable to do so.

DPSS reported that although Father claimed he was managing his mental health issues with medication and therapeutic intervention, it appeared that his mental health

9

had not improved.  He was notably agitated and irritated without any provocation.  DPSS expressed concern that his behavior over a prolonged period could cause the girls to suffer emotional and psychological distress, which could have an impact on their overall emotional functioning.

On August 15, 2023, Father filed *Marsden*[3] and *Faretta*[4] requests to change his attorney or represent himself.  The court granted Father's *Marsden* request to change his attorney.  His *Faretta* request was denied.  The court also ordered the protective custody warrants for the girls recalled.

On August 28, 2023, Father renewed his JV-180 form request to change the court order on July 7, 2023, and filed a petition for access to the juvenile case file.  He attached two letters dated July 20, 2023, from a VA psychiatrist and a VA psychologist, stating Father had last been seen for treatment on March 13, 2023, and had been seeing other providers since March 2023, and was also seen for therapy eight times in 2021, and five times in 2022.  The psychiatrist stated Father had been compliant with taking his medications and attending appointments.  The psychologist stated Father had actively engaged in therapy for a variety of mental health concerns and had reached out to the VA crisis Line Call Center as needed.  Father also provided a letter from a therapist stating he had received mental health services, which included family therapy on June 29, 2023.

---

[3]  *People v. Marsden* (1970) 2 Cal.3d 118.

[4]  *Faretta v. California* (1975) 422 U.S. 806.

10

On September 8, 2023, DPSS filed an addendum report, stating that DPSS visited the girls at their relative caregiver's home. The girls reportedly were "flourishing and thriving with all aspects of their care being met." Father reportedly contacted DPSS by sending daily texts and voicemail messages, which were "disorganized, fragmented, and [had] no context." DPSS attempted to schedule visitation but Father thwarted such efforts by failing to cooperate and agree to a date and time. DPSS reported it was concerned because Father was continually recording conversations and his uncooperative nature raised a "vital concern for the safety of the children" and DPSS staff. DPSS further stated that Father also had not reported participating in services.

On October 13, 2023, Father filed a motion requesting a new attorney, and objecting to DPSS's request for the appointment of a guardian ad litem for Father. Later on, the court granted Father a new attorney, and denied DPSS's request to appoint a guardian ad litem for Father.

Also on October 13, 2023, DPSS filed an addendum report stating that the girls were doing well with their relative caregiver. DPSS reported that on September 19, 2023, Father left a scheduled visit early, before the girls and the social worker arrived. The girls, who arrived a little late due to their bus ride, were disappointed, but "displayed resilience" when told Father left because of a broken tooth. DPSS asked Father to return. In response, Father "unleashed a yelling tirade, stating he was lied to and had a broken tooth that needed to be attended to." When the social worker asked if Father wanted to speak to the girls, he was "irate and continued his outburst." Throughout the rest of the

11

day and into the following morning, he continued sending the social worker a "verbal tirade" of multiple text messages and voice memos.

During the jurisdiction/disposition hearing on October 31, 2023, the court admitted into evidence Father's documents, which included (1) a letter dated September 12, 2023, from the VA, stating he had been seeing a psychiatrist since 2014, and was last seen in September 2023, (2) a treatment summary dated June 27, 2023, from Loma Linda Healthcare System, stating he had started mental health treatment in 2021, and had recently received treatment in May 2023, and (3) a letter dated July 18, 2023, from Psych Partners, stating he had attended three therapy sessions, one of which was with the girls, to address the girls' grieving. Father argued that, as to his mental health, the evidence showed he had been receiving regular treatment and was consistently medication-compliant. He maintained there was nothing showing he had any unresolved mental health issues.

As to the allegation regarding Father using marijuana, Father argued that other than the referrals, there was no evidence he visited a dispensary and left the girls in the car. Father argued the referrals were not credible because a subsequent investigation did not result in any showing that Father was using controlled substances while caring for the girls. As to Father's criminal history, Father argued there was no showing of a nexus between his use of marijuana and a risk of harm to the girls. With regard to the allegation of Father's emotional abuse of the girls, Father argued there was no evidence of that or any physical effects caused by Father's conduct. He also argued there was no evidence

12

Father treated the girls in a hostile way or that anything Father did with the girls was inappropriate.

DPSS agreed the allegation Father failed to obtain regular treatment and medication could be stricken, but noted Father admitted to suffering from PTSD and that his problematic behavior was well documented. DPSS also argued Father had admitted to marijuana use, visiting dispensaries, and having a criminal history involving drugs. As to the emotional abuse allegation, DPSS argued Father had acted inappropriately when addressing the girls' grieving their mother's passing, and this was sufficient to establish a substantial risk of the girls suffering emotionally in the future.

Minor's counsel argued during the jurisdiction/disposition hearing that, despite receiving mental health treatment, Father continued to exhibit behaviors demonstrating he posed a safety risk for the girls. Minor's counsel noted that Father's psychological evaluation summary stated he could be "highly argumentative, resistive to self-introspection which has led to further negative interactions with the Department." His "probable diagnosis" included (1) PTSD, (2) unspecified personality disorder, (3) turbulent type with narcissistic and compulsive features, and (4) cannabis use disorder. Minor's counsel noted that the girls love their father and want to reunify with him. Therefore, minor's counsel recommended providing him with reunification services, counseling, parenting classes, and other types of therapy that would assist him in maintaining appropriate behavior that is not destructive to the girls.

Minor's counsel informed the court that "[t]here's been numerous incidents where the father has been basically inappropriate with the social workers, threatening and showing extremely aggressive, violent behavior. And I don't believe the minors at this point can be maintained safely in the [F]ather's care as long as we're having this rather tumultuous pattern being displayed by the [F]ather."

The juvenile court took the matter under submission and continued the jurisdiction/disposition hearing. During the continued hearing on November 21, 2023, the juvenile court sustained the allegations in the dependency petition, as amended, and ordered the girls removed from Father's care. The court ordered reunification services for Father, and found he "had made no progress toward alleviating or mitigating the causes necessitating placement." The court also ordered an assessment to determine if Father required substance abuse services and ordered Father to comply with the assessment recommendations.

The juvenile court also heard and denied Father's JV-180 petition filed on August 28, 2023, requesting to change the July 7, 2023 detention hearing order, on the ground Father did not meet his burden of proof of showing changed circumstances or that granting the JV-180 petition was in the girls' best interests.

Father filed a notice of appeal of the November 21, 2023 order.

III.

DISCUSSION

A. *Sufficiency of Evidence to Support Jurisdiction*

Father contends the evidence was insufficient to support the juvenile court's assertion of jurisdiction over the girls. We disagree.

1. Standard of Review

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].""""" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for

15

jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

2. Petition Allegations

The Petition alleges jurisdiction under section 300, subdivision (b)(1) based on Father failing to protect the girls, resulting in the girls suffering or being at substantial risk of suffering serious physical harm or illness because of Father's mental illness and substance abuse (marijuana).

The Petition also alleges jurisdiction under section 300, subdivision (c), based on the girls' suffering or being at risk of suffering serious emotional harm because Father interfered with the girls grieving the recent death of their mother. In addition, Father has an extensive family law history with the girls' deceased mother and R.M.'s mother, and Father is prohibited from having any contact with R.M. unless in a therapeutic environment, because Father caused R.M. to suffer emotional abuse.

3. Law Applicable to Finding Jurisdiction

Because subdivision (b)(1) of section 300 most closely describes the most pervasive underlying circumstances interfering with Father's ability to provide a safe, stable home for the girls, we will focus on the sufficiency of evidence supporting jurisdiction under subdivision (b)(1).

16

Section 300, subdivision (b)(1) provides in relevant part that a child is subject to juvenile court jurisdiction if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:  [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. . . .  [¶]  [¶]  (C) The willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment. [¶]  (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

Section 300, subdivision (b)(1) requires DPSS "to demonstrate three elements by a preponderance of the evidence:  (1) one or more of the statutorily-specified omissions in providing care for the child (inability to protect or supervise the child, the failure of the parent to provide the child with adequate food, clothing, shelter, or medical treatment, or inability to provide regular care for the child due to mental illness, developmental disability or substance abuse); (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness."  (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561 (*Joaquin C.*).)

4. Risk of Harm

Father argues that, regardless of his mental health issues, "'[h]arm to a child cannot be presumed from the mere fact the parent has a mental illness.'"  (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226, quoting *Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1079.)  Father acknowledges he has been diagnosed with mental

17

health issues and has been receiving treatment and taking medication. He argues that, nevertheless, this is not a valid ground for finding jurisdiction over the girls and removing them from him. There must be a nexus between his mental health condition and the risk the girls will suffer serious physical injury or illness. Father argues there has been no showing of such a nexus. We disagree.

Father cites *Joaquin C.*, *supra*, 15 Cal.App.5th 537, for the proposition that the juvenile court erred in finding jurisdiction over the girls because there was no evidence that Father's mental health issues significantly impaired his ability to care for them. *Joaquin C.* is distinguishable. In *Joaquin C.*, *supra*, 15 Cal.App.5th 537, the court found the juvenile court erred in asserting jurisdiction under section 300, subdivision (b), over Joaquin, whose mother suffered from mental illness. (*Joaquin C.*, *supra*, at p. 540.) The mother suffered from "'Psychosis vs. Schizophrenia, paranoid type.'" (*Ibid*.) Joaquin, who was an infant, and his mother lived with Joaquin's maternal grandmother and maternal aunt, who provided a strong family support system and assisted the mother when she needed it. There was evidence Joaquin was well cared for in a clean comfortable home, and there was no evidence that the mother's mental health prevented Joaquin from receiving adequate supervision and protection, or regular care.

The court in *Joaquin C.* reversed the jurisdiction finding and disposition order, and dismissed the dependency petition on the ground that the Department of Child and Family Services (DCFS) failed to meet its burden of proof of demonstrating by a preponderance of the evidence that the mother had failed to adequately supervise or

18

protect Joaquin or provide regular care for him.  (*Joaquin C.*, *supra*, 15 Cal.App.5th at pp. 540, 565.)

Here, the focus is not only on Father's mental health issues, but is also on his past conduct and the risk of Father not adequately supervising the girls and neglecting them because of his mental health issues and use of marijuana.  Unlike in the instant case, in *Joaquin C.*, there was no evidence the mother ever failed to adequately supervise or protect her son or that she had ever demonstrated an inability to provide regular care for him because of her mental illness or use of substance abuse.  (*Joaquin C.*, *supra*, 15 Cal.App.5th at p. 562, fn. 7.)  Also, in *Joaquin C.*, there was evidence that the mother was raising Joaquin with strong family support in her home, she was attentive, caring, and responsible, and there were no reports that she left Joaquin alone or unsupervised.  (*Id.* at pp. 562-563.)  Her therapist told DCFS that, even when the mother was not taking her psychotropic medication, she cared for Joaquin appropriately and there was no evidence that her mental problems impacted her ability to do so.  (*Id.* at p. 563.)

Here, the girls had been living with Father without any relatives living in the same household, assisting with the case and supervising when Father suffered from mental health issues.  Furthermore, there is substantial evidence the girls suffered or are at risk of suffering serious physical harm or illness because of Father's inability to adequately supervise, protect, or provide regular care of the girls due to his mental illness and substance abuse.  There was a referral in May 2023, in which Father reportedly hit the girls, yelled at them, and withheld food as punishment.  Father also was so abusive to the

19

girls' half-sibling, R.M., that Father was prohibited from having contact with him other than in a therapeutic setting. In addition, it was reported that Father locked himself in the bathroom for lengthy periods of time during the night, to smoke marijuana. This conduct required the girls to hold their urine while he was in the bathroom because they feared Father would yell at them if they tried to use the bathroom.

When DPSS investigated the referral in May 2023, R.M.'s therapist reported that, when Father showed up at her office, he was verbally aggressive with staff, recorded them, threatened them, and insisted on being present during the girls' sessions, which was not advisable. The therapist further reported that Father was verbally aggressive with the girls, struck them with a belt, and locked himself in the bathroom at night, which caused the girls to be frightened. When DPSS interviewed L.M. at school, she confirmed Father spent an excessive amount of time in the bathroom, which she said caused her to worry.

DPSS received two additional referrals in June 2023, reporting that Father was alienating the girls from their extended family due to his mental health diagnosis of bipolar disorder and PTSD. It was also alleged he was smoking marijuana in the girls' presence, and he refused to acknowledge the mental health needs of the girls as they grieved their mother's recent murder. During the second referral in June, the caller stated concern for the girls because of Father's paranoia and because he carried a gun without a concealed carry permit. There were also concerns about his mental health, marijuana usage, and purchasing unknown pills from drug dealers. In addition, the girls had stated he would hit them if they did not do what he said.

DPSS further reported that in June 2023, a paternal family member reported concern about the safety and well-being of the girls because of Father's mental health-related behaviors. The girls had told the relative that Father had forbidden them from mentioning their mother and grieving her loss. They reportedly sat in front of their mother's picture, talking to her and crying, distraught over her death. Father reportedly displayed dichotomous and severe behavior. One moment he would be loving and inclusive and then he would become hostile and verbally aggressive. The girls also said that on one occasion he requested the girls be picked up from him because he was "'going crazy'" and needed to get his medication because he would not be able to appear in family court in his current state.

Even assuming Father had sufficient family support to assist him in caring for the girls while he was unable to do so because of his mental health, such supplemental care was contingent upon someone requesting assistance, which left the girls vulnerable in the event Father did not request help. He apparently did not do so when he locked himself in the bathroom during the night, or when he reportedly left the girls in the car alone while he purchased marijuana at a dispensary.

In June 2023, DPSS further reported that Father has an extensive child welfare history dating back to 2015, in which DPSS had conducted numerous investigations involving his family because of his mental health issues and behavior. There were allegations of general neglect, physical abuse, emotional abuse, and Father failing to cooperate and participate in services, although we note the record shows he was currently

21

receiving mental health treatment. DPSS also reported that in March 2021, Father admitted to having taken the three children, including R.M., to a marijuana dispensary and leaving them in the car while making a purchase. During an investigation in October 2022, R.M. reported Father smoked marijuana in the home, and scared R.M. when Father screamed. R.M. began to cry when DPSS told him Father would be made aware of the information R.M. provided DPSS. R.M.'s mother also expressed fear of Father and said she was concerned about Father's effect on all of the children's mental health. The girls' mother had had a restraining order against him up until she died in January 2023.

Even though Father was receiving mental health treatment and was taking medication, the evidence in the record indicates his mental health condition continued to pose a risk of harm to the girls. When DPSS interviewed him in July 2023, Father reportedly went off on tangents and lengthy tirades. He acknowledged his diagnosis of PTSD and suffering from a traumatic brain injury, but denied having manic episodes, verbal aggression, hostility, or paranoia, and said he was participating in therapy and taking his medication as directed. DPSS reported in July 2023, that Father participated in a psychological evaluation, with a "probable diagnosis" of PTSD, unspecified personality disorder turbulent type with narcissistic and compulsive features, and cannabis use disorder. The psychologist recommended that Father complete parenting and anger management classes as well as continue his current therapeutic components. When DPSS interviewed the girls in July 2023, they again said he stayed in the restroom for long periods of time at night.

During Father's visits with the girls in July 2023, instead of engaging with the girls, he "launched into a verbal diatribe about his federal lawsuit" and was "irate, loud, disruptive, and verbally aggressive." The girls reportedly appeared startled and concerned about Father's behavior. DPSS reported in the July 2023, jurisdiction/disposition report that, although Father claimed he was managing his mental health issues with medication and therapeutic intervention, it appeared that his mental health had not improved. He continued to be notably agitated and irritated without any provocation. DPSS expressed concern that his behavior over a prolonged period could cause the girls to suffer emotional and psychological distress, which could have an impact on their overall emotional functioning.

DPSS further stated in its September 2023, addendum report that it was concerned because of Father's uncooperative nature, which raised a "vital concern for the safety of the children" and DPSS staff. DPSS also noted Father had not reported participating in services, although we note the record shows he was receiving mental health treatment. DPSS reported that during a visit in October 2023, Father left a scheduled visit early, before the girls and the social worker arrived. When he returned later at DPSS's request, he "unleashed a yelling tirade." When asked if he wanted to speak to the girls, he was "irate and continued his outburst" and "verbal tirade" of multiple text messages and voice memos throughout the rest of the day. Unlike in *Joaquin C.*, in which there was an in-home support system to ensure the girls' protection, here the record demonstrates that Father's mental health instability and volatility directly impacted his actions while in the

23

girls' presence, and detrimentally affected his ability to supervise, care for, and protect the girls.

Based on the totality of the evidence, we conclude there was substantial evidence that Father's mental health illness and use of marijuana while he locked himself in the bathroom at night was more than sufficient to support the juvenile court's finding of jurisdiction under section 300, subdivision (b)(1), based on the girls being at risk of Father failing to adequately supervise and protect them, and provide adequate regular care for them.

Although there is also evidence supporting jurisdiction under section 300, subdivision (c) (emotional damage), we need not address this additional ground supporting jurisdiction, because a reviewing court can affirm the juvenile court's finding of jurisdiction if any one of the statutory bases for jurisdiction enumerated in the petition is supported by substantial evidence. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) Here, there was substantial evidence supporting jurisdiction under section 300, subdivision (b)(1).

B. *Sufficiency of Evidence to Support Removal*

Father contends the evidence was insufficient to support the juvenile court's disposition order removing the girls from his custody. The juvenile court found during the disposition hearing that "The children's out-of-home placement is necessary. . ." and Father "ha[d] made no progress toward alleviating or mitigating the causes necessitating placement."

24

Under section 361, subdivision (c)(1), "[b]efore the court may order a minor physically removed from his or her parent, it must find, by clear and convincing evidence, the minor would be at substantial risk of harm if returned home and there are no reasonable means by which the minor can be protected without removal. (§ 361, subd. (c)(1).) A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citations.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citations.]" (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136.) We apply the substantial evidence test when reviewing the disposition findings and order. (*In re A.S.* (2011) 202 Cal.App.4th 237, 244; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

Here, the evidence showed that Father, despite being offered services and receiving mental health treatment, continued to suffer from mental health issues and use marijuana, which, as discussed in the preceding section, created a substantial risk of harm to the girls. The evidence showed that Father had received mental health treatment and other services for several years, yet he continued to be emotionally unstable and volatile while in the girls' presence, and when caring for the girls. There is evidence he acted not only aggressively and abusively toward DPSS staff while in their presence, but also did so while caring for and disciplining the girls and his son, R.M. The evidence was thus

25

sufficient to support the juvenile court's finding that the girls would be at risk if they remained in Father's care.

It was further reported Father carried a gun without a permit, raising safety concerns, particularly when Father was excessively angry and emotionally unstable around the girls. Therapists, relatives, and the DPSS reported concerns for the girls' safety because of Father's mental health issues and volatile, unstable behavior. The record indicates that Father did not participate in any anger management or parenting courses, or participate in substance abuse treatment, as recommended in 2023, by the psychologist who evaluated him. In addition, Father denied that his use of marijuana interfered with his parenting, even though he reportedly was spending nights locking himself in the bathroom while using marijuana, leaving the girls unsupervised, worried, unable to use the bathroom, and afraid to communicate with him should they have any needs.

Because the girls' mother had died, and reasonable efforts had been made to prevent or eliminate the need for removal of the girls from their Father, out-of-home placement was necessary. The juvenile court therefore reasonably found that, despite Father participating in mental health treatment, the girls could not be safely left in his care and there were no other reasonable alternatives to their removal from Father. Substantial evidence thus supports the court's order removing the girls from Father's care and custody under section 361, subdivision (c)(1).

Father argues the juvenile court failed to address or make proper findings regarding reasonable means to prevent removal of the girls from Father's custody, as required under California Rules of Court, rule 5.695, subdivision (d). Father maintains the juvenile court could have ordered DPSS to conduct unannounced home visits, ordered Father to refrain from consuming marijuana while caring for the girls, or ordered in-home support services, such as Wraparound services. However, under California Rules of Court, rule 5.695, subdivision (d), the juvenile court was not required to state its reasoning or findings for concluding DPSS made reasonable efforts to prevent removal of the girls from Father. Furthermore, unlike in *In re Ashly F.* (2014) 225 Cal.App.4th 803, relied on by Father, DPSS sufficiently stated in the jurisdiction/disposition report its efforts to avoid removal. Despite those efforts, Father's mental health did not improve significantly and continued to interfere with his ability to adequately supervise and care for the girls. In concluding that removal of the girls from Father was necessary, the juvenile court therefore reasonably concluded that Father had "made no progress toward alleviating or mitigating the causes necessitating placement."

C. *ICWA*

Father contends the juvenile court and DPSS failed to comply with the initial duty of inquiry under section 224.2. Father therefore requests this court to vacate the finding that ICWA does not apply.

    1.  ICWA Procedural Background

27

When filing the dependency petition on June 21, 2023, DPSS attached an ICWA 010 form stating that DPSS had no reason to believe the girls are or may be Native American children. DPSS also filed an Out-of-Custody report stating that on October 3, 2022, Father denied any Native American ancestry.

At the detention hearing on July 7, 2023, the court requested the parties to disclose information regarding any relatives of the girls who have Native American ancestry, and to fill out an ICWA-020 form. Father filed an ICWA-020 form that same day, stating that none of the listed "Indian Status" factors applied to him or the girls. The court also asked the parties at the detention hearing whether they knew or had reason to know that the girls were Native American children, and found there was no reason to believe or reason to know the girls were Native American children. The juvenile court thus found ICWA did not apply.

On July 17, 2023, Father again told DPSS he did not have any Native American ancestry. He also denied that the girls' mother had any Native American ancestry.

In the jurisdiction/disposition report filed on August 2, 2023, and September 8, 2023, addendum report, DPSS recommended the court find that the girls may be Native American children, but the report further states that ICWA does not apply. Then, later in the report, DPSS recommends the court find that the girls are not Native American children and that ICWA does not apply.

At the contested jurisdiction hearing on September 13, 2023, Father filed another ICWA-020 form stating that none of the listed "Indian Status" factors applied to him or

28

the girls. During the hearing, the court asked Father if he knew or had reason to know that the girls were Native American children. He said, "No." The court concluded sufficient ICWA inquiry had been made and there was no new information to indicate ICWA might apply.

At the continued contested jurisdiction hearing on November 21, 2023, the juvenile court found DPSS had complied with its duty of ICWA inquiry, there was no reason to know the girls were Native American children, and the girls were not Native American children.

### 2. Applicable ICWA Law

Federal regulations implementing ICWA require that state courts, at the commencement of a juvenile dependency proceeding, "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a) (2022).) Under California law, the court and county child welfare department also "'have an affirmative and continuing duty to inquire whether a child,' who is the subject of a juvenile dependency petition, 'is or may be an Indian child.' [Citations.] The child welfare department's initial duty of inquiry includes 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' (§ 224.2, subd. (b).)" (*In re Austin J.* (2020) 47 Cal.App.5th 870, 883.) State courts must also

29

"instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (25 C.F.R. § 23.107(a) (2022).)

"CFS is required to document its ICWA inquiry efforts throughout the proceedings, beginning with the petition, which must be filed with a completed Judicial Council form ICWA-010(A), Indian Child Inquiry Attachment (Cal. Rules of Court, rule 5.481(a)(1)). All filings thereafter must include 'a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status.' (Cal. Rules of Court, rule 5.481(a)(5).) If the court finds that CFS has complied with its duty of inquiry and there is no reason to know that the child is an Indian child, then the court may find that ICWA does not apply. (§ 224.2, subd. (i)(2); Cal. Rules of Court, rule 5.481(b)(3)(A).) Before the juvenile court makes a finding that ICWA does not apply, it must 'first ensur[e] that [CFS] has made an adequate inquiry under ICWA and California law, and if necessary, the court must continue the proceedings and order [CFS] to fulfill its responsibilities.' [Citation.] A juvenile court's finding that ICWA does not apply implies 'that social workers had fulfilled their duty of inquiry.' [Citation.] 'We review a court's ICWA findings for substantial evidence. [Citations.] "We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." [Citation.] Mother [or the father], as the appellant, "has the burden to show that the evidence was not sufficient to support the findings and orders." [Citation.]' (*Ibid.*)" (*In re Dominick D.* (2022) 82 Cal.App.5th 560, 566-567.)

30

3. *Analysis*

Father argues the juvenile court and DPSS did not comply with the ICWA duty of inquiry because there is no evidence of any investigation or inquiry as to the girls' deceased mother's Native American ancestry or inquiry of the girls' relative caregiver. We agree. DPSS has not met its burden of showing it discharged its duty of initial inquiry. There has been no showing that DPSS or the juvenile court made any effort to determine whether there was maternal Native American ancestry, other than the juvenile court asking Father. He stated the girls' deceased mother did not have Native American ancestry, but there is no evidence that any effort was made to locate and contact any maternal relatives to inquire whether any maternal relatives have Native American ancestry. There is also no evidence of ICWA inquiry of the relative caregiver. Father argues it is unknown whether the relative caregiver is a maternal or paternal relative. However, we note the record states the caregiver is a paternal relative.

Because we conclude there was sufficient evidence to support the jurisdiction and disposition orders, as discussed in the preceding section, "we need not disturb the juvenile court's jurisdiction/disposition order just because the duty of initial ICWA inquiry has not yet been fully satisfied." (*In re S.H.* (2022) 82 Cal.App.5th 166, 175 (*S.H.*).) As the court in *S.H.*, *supra*, at pages 175, 179, concluded, there is no need to conditionally reverse or conditionally affirm the juvenile court's erroneous order finding ICWA does not apply, because the ICWA duty of inquiry and notice will continue after this appeal and remand, regardless of the previous ICWA finding.

In *S.H.*, the court explained, "Instead of focusing on whether the same ICWA finding would have been made absent error, we focus instead on whether the social service agency acknowledges error and we thus have reason to believe that its duty of inquiry will be satisfied. Where there is such an acknowledgement, we see no reason to set aside the jurisdiction/disposition order—even conditionally." (*S.H.*, *supra*, 82 Cal.App.5th at p. 176.) This is because "the duty to inquire is a *continuing* one. (§ 224.2, subd. (a); *In re Isaiah W.*, *supra*, 1 Cal.5th at p. 6.) The Agency likewise has a duty 'on an ongoing basis' to report 'a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status.' ([Cal. Rules of Court, rule] 5.481(a)(5).) The juvenile court, even after it concludes that ICWA does not apply, retains the power (and duty) to *reverse* that determination 'if it subsequently receives information providing reason to believe that the child is an Indian child.' (§ 224.2, subd. (i)(2); see also Cal. Rules of Court, rule 5.482(c)(2).)" (*S.H.*, *supra*, at p. 176.)

The *S.H.* court reasoned that "[t]he fact that the Agency here has acknowledged error indicates that it understands its duty to ask the maternal relatives about possible Native American ancestry. The Agency must satisfy this duty, if it has not done so already, and report its findings to the juvenile court. . . . And should the Agency learn additional information indicating a 'reason to believe' the minor is an Indian child, thus triggering a duty of further inquiry, it must conduct additional interviews 'as soon as practicable.' (§ 224.2, subd. (e) . . . .)" (*S.H.*, *supra*, 82 Cal.App.5th at pp. 176-177.)

Here, DPSS acknowledges in its respondent's brief that it "is aware that ICWA inquiry is a continuing duty."  As the court in *S.H.* concluded, "It would make little sense to reverse the jurisdiction/disposition order in order to direct the Agency and the juvenile court to do something they recognize they must do anyway."  (*S.H.*, *supra*, 82 Cal.App.5th at p. 175.)

In Father's reply brief, he states that he is not requesting this court to reverse the dispositional orders.  He is only requesting this court to find that there was insufficient evidence to support the finding that ICWA does not apply, and reverse the finding, with the matter remanded for ICWA compliance.  DPSS argues there is no need to vacate any ICWA findings because ICWA obligations are continuing duties.

We agree the ICWA inquiry and notice errors here do not require reversing or vacating the juvenile court's jurisdictional or dispositional findings and orders, other than the premature finding itself that ICWA does not apply.  (*In re Dominick D.*, *supra*, 82 Cal.App.5th at p. 567.)  We accordingly order vacated the finding that ICWA does not apply, but we otherwise affirm and direct the juvenile court on remand to order DPSS to comply with its inquiry and (if applicable) notice obligations under ICWA and related California law.  (*Id*. at pp. 567-568.)

33

IV.

DISPOSITION

The finding that ICWA does not apply is ordered vacated.  The juvenile court and DPSS are directed, upon remand, to comply with their ICWA inquiry and notice obligations.  In all other respects, the jurisdiction and disposition findings and orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

34